UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 16-cv-21658-KMW

**HARRIUS JOHNSON,**

    Plaintiff,

v.

**MIAMI-DADE COUNTY**,

    Defendant.

_____/

### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, HARRIUS JOHNSON ("Plaintiff"), hereby moves this Honorable Court for entry of summary judgment against Defendant, MIAMI-DADE COUNTY ("Defendant"). In support thereof, Plaintiff states as follows:

### INTRODUCTION AND PRELIMINARY STATEMENT

This is an action by Plaintiff for, *inter alia*, declaratory and injunctive relief and damages pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 ("Title VII"); the Florida Civil Rights Act of 1992, Florida Statutes, Chapter 760, *et seq*. ("FCRA"); and the Civil Rights Act of 1866, 42 U.S.C. §1983 ("§ 1983"), to redress injuries resulting from Defendant's unlawful race-based discriminatory and retaliatory treatment of Plaintiff. At bar, Plaintiff moves for entry of summary judgment against Defendant as to liability on Counts III through VIII— racial discrimination and retaliation, respectively under the above-cited statutes—of his First Amended Complaint [ECF No. 18].

As a preliminary matter, it must be noted that, When § 1983 is used as a parallel remedy for violation of Title VII, the elements of the two causes of action are the same. *Cross v. Alabama, State Department of Mental Health & Mental Retardation,* 49 F.3d 1490, 1508 (11th Cir. 1995); *Hardin v. Stynchcomb,* 691 F.2d 1364, 1369 n. 16 (11th Cir.1982); *Whiting v. Jackson State University,* 616 F.2d 116, 123 (5th Cir.1980); *Garcia v. Gloor,* 609 F.2d 156, 164 (5th Cir. 1980); *Blum v. Gulf Oil Corp.,* 597 F.2d 936, 938 (5th Cir. 1979); *see also Johnson v. Alexander,* 572 F.2d 1219, 1223 n.3 (and cases cited therein) (8th Cir. 1978), *cert. denied,* 439

U.S. 986, 99 S.Ct. 579, 58 L.Ed.2d 658 (1978). Identical methods of proof, as described in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), are used. *Richardson v. Leeds Police Department,* 71 F.3d 801, 805 (11th Cir. 2000). Additionally, because the FCRA is patterned on Title VII, under Florida law, decisions construing Title VII are applicable to and guide the analysis of claims under the FCRA. *Harper v. Blockbuster Entertainment Corp.,* 139 F.3d 1385, 1387, 1389 (11th Cir. 1998). Thus, the legal framework for the analysis of Plaintiff's claims under § 1983, Title VII, and the FCRA is the same.

To establish a prima facie case of discrimination based on circumstantial evidence, Plaintiff must show (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was treated less favorably than a similarly-situated individual outside his protected class. *Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ. ex rel. Univ. of S. Fla.,* 342 F.3d 1281, 1289 (11th Cir. 2003). To establish a prima facie case of retaliation based on circumstantial evidence, Plaintiff must show (1) that he engaged in statutorily protected expression; (2) that he suffered an adverse employment action; and (3) that there is some causal relationship between the two events. *Hollifield v. Reno,* 115 F.3d 1555, 1566 (11th Cir. 1997). Should the plaintiff succeed in making a prima facie case, "the burden of production shifts to the employer . . . to introduce evidence of some legitimate, nondiscriminatory reason for its employment decision." *Kidd v. Mando Am. Corp.,* 731 F.3d 1196, 1202 (11th Cir. 2013) (internal quotation marks omitted). The plaintiff must then show the employer's given reason is pretextual. *Id.*

Here, most of these elements can be disposed of with little discussion or argument. First, Plaintiff is an African American male [Pla. SMF ¶ 1]—undeniably within a class of individuals protected under state and federal discrimination laws. Second, Plaintiff was well qualified for his position with Defendant. Plaintiff commenced employment with Defendant on or about April 18, 1994 as a Corrections Officer. Pla. SMF ¶ 2. In August 1997, Plaintiff began working for the Miami-Dade County Police Department as a Police Officer. *Id.* At the time of his termination, Plaintiff was a supervisor who held the rank of Police Sergeant, with a successful three years of above satisfactory and outstanding employee evaluations. Pla. SMF ¶ 3. In addition, Plaintiff had also recently and successfully passed the Police Lieutenant's Examination, making him eligible to advance in rank. *Id.* Plaintiff had also received throughout his career numerous awards and commendations. *Id.*

Third, Plaintiff was indisputably subject to multiple adverse employment actions. After reporting the discriminatory conduct of a subordinate officer to his superiors, Plaintiff's immediate supervisor, Lt. Leonard Ricelli, began giving Plaintiff negative monthly reports that were false and inaccurate. Pla. SMF ¶ 5. These false reports adversely affected Plaintiff's overall performance evaluation, Plaintiff's opportunities for advancement, and generally altered the terms and conditions of Plaintiff's employment. *Id.* Furthermore, Plaintiff was given multiple suspensions without pay [Pla SMF ¶¶ 16, 30, 39, 45, 60] before ultimately being relieved of duty and terminated [Pla. SMF ¶¶ 43, 58, 61, 76-77]. Finally, there can be no doubt that Plaintiff engaged in numerous instances of protected activity including filing numerous charges of discrimination with the EEOC [Pla. SMF ¶¶ 11, 16, 23, 28, 51, 53, 62, 83], and sending countless other written complaints of discrimination and retaliation to his superiors and other county officials all the way up the chain of command to the Mayor's office [Pla. SMF ¶¶ 12-13, 15, 18, 28, 37, 55].

In light of the foregoing, Plaintiff will focus the remainder of this Motion on demonstrating (1) that Plaintiff was treated less favorably than similarly situated, non-black employees, (2) that a causal connection exists between Plaintiff's protected activity and the adverse employment actions, and (3) that any reason proffered by Defendant for said actions is merely pretext for unlawful discrimination and retaliation.

## MEMORANDUM OF LAW

### A.     Legal Standards For Summary Judgment

Federal Rule of Civil Procedure 56(b) provides that a party against whom relief is sought may move for summary judgment on all or part of the claim. Rule 56(c)(2) further provides that the judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

The moving party is entitled to summary judgment when the non-moving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant is not required to produce evidence in support of its motion. *Exemar v. Urban League of Greater Miami, Inc.*, 585 F.Supp.2d 1377, 1381 (S.D. Fla. 2008). Nor is the

movant required to produce evidence to disprove an opponent's claim. *Cagle v. Bruner*, 921 F.Supp. 726, 729 (M.D. Fla. 1995). The movant need only establish that, after adequate time for discovery, there is an absence of evidence to support the non-moving party's case. *Catrett*, 477 U.S. at 325. The non-movant need not be given the benefit of every inference, but only every reasonable inference. *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).

The court must hear the evidence and all permissible fact inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-movant, however, "must do more than simply show that there is some metaphysical doubt as to the material fact." *Id*. at 586. Rather than merely alleging the existence of some factual dispute, the non-moving party must rebut any facts properly presented by way of affidavits or other evidence demonstrating the existence of a genuine and material issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A mere scintilla of evidence in support of the non-movant's position is insufficient to defeat summary judgment. *Louis v. Encore Computer Corp.*, 949 F.Supp. 836, 838 (S.D. Fla. 1996). Similarly, if the evidence is merely colorable or is not significantly probative, summary judgment is proper. *Anderson*, 477 U.S. at 249; *Louis*, 949 F.Supp. at 838.

### B.    Plaintiff Was Treated Less Favorably Than Similarly Situated, Non-Black Employees.

Having readily demonstrated satisfaction of the first three elements of his prima facie case of discrimination, Plaintiff addresses the final element: that he was treated less favorably than similarly situated non-black employees. The reasons Defendant gave for Plaintiff's termination were that Plaintiff (1) slammed a door, causing it to jam and lock Capt. White and Lt. Vasquez inside an office, and (2) failed to update Plaintiff's address. Pla. SMF ¶ 58. Yet, record evidence is clear, however, that white officers of various rank committed similar to much more egregious violations but were not terminated.

For example, Officer Rachel Meadors (White, female) used racial slurs and racist comments, such as that she would "hang a nigger," but she initially received no discipline. Pla. SMF ¶ 65. Yet, when Plaintiff filed an EEOC complaint about officer Meadors not receiving discipline, she was given a five-day suspension only by Chief Hernan Organvidez, for calling

black people "Niggers and Bitches." *Id*. Defendant omitted from its Internal Affairs investigation report, and from the discipline memo, that officer Meadors had stated that she would "hang a nigger" even though officer Debbe Janac had witnessed and testified to that fact. *Id*. As well, officer Meadors did not have her vehicle taken away even after being involved in two preventable police vehicle crashes in a year, whereas a similarly situated Black Hispanic officer, Juan Germosen, had his vehicle taken away for the same violation. Pla. SMF ¶ 7.

Another example occurred when, on March 13, 2015, Officer Harry Espinosa (White, Male) filed a false Police Report against Plaintiff. Pla. SMF ¶ 24. Officer Espinosa alleged that Plaintiff had refused to fill out an exposure form, and stated that Plaintiff was instead going to place him on light duty, relieve him of his marked police vehicle and service weapon, and place him on sick leave after he reported exposure to tuberculosis during a routine call. *Id*. Plaintiff became aware of the false report the following day, on March 14, 2015. *Id*. That same day, Plaintiff reported the foregoing to Plaintiff's immediate supervisor, Lt. Ferbee-Blackshear, who conducted an investigation into the matter. She also determined that Officer Espinosa had been untruthful and reported the violations to her superiors. *Id*.

Lt. Ferbee-Blacksheer documented and reported her findings to Captain Tyrone White. Pla. SMF ¶ 25. Initially, Cpt. White attempted to cover up the allegations by ordering Lt. Shawn Browne to have Officer Mary Holmes of the Crime Analysis Unit pull the report out of official records. *Id*. Cpt. White sent the report back to Lt. Browne and told him to have Officer Espinosa change it or not report it. *Id*. This was documented by Officer Holmes. *Id*. Accordingly, on or about March 16, 2015, Lt. Shawn Browne instructed Officer Espinosa to either "make corrections or not report the case." *Id*.

Later, on or about March 22, 2015, Officer Espinosa was allowed to submit a new report which did not include the same allegations against Plaintiff. Pla. SMF ¶ 26. Officer Espinosa was not arrested or subjected to any form of disciplinary action at that time despite his falsification and misrepresentation. *Id*. On March 31, 2015, Lt. Ferbee-Blackshear reported Plaintiff's complaint to Sgt. William Houston in the Professional Compliance Bureau. Pla. SMF ¶ 27. Contrary to PCB standard operating procedures, however, Sgt. Houston did not report this crime to the State Attorney's Office or open a formal Internal Affairs investigation. *Id*. Instead, the case was handled as a simple Contact Report and redirected on July 2, 2015 back to the Northside District to Cpt. White and Major Ricky Carter to handle administratively. *Id*.

On or about April 28, 2015, the Professional Law Enforcement Association wrote a letter on Plaintiff's behalf to Director JD Patterson regarding the above-described improprieties. Pla. SMF ¶ 28. As well, on or about April 30, 2015, Plaintiff timely filed a fourth Charge of Discrimination with the EEOC, which was assigned Charge No. 510-2015-02961. *Id*. Ultimately, Defendant gave Officer Espinosa with a 5-day suspension. Pla. SMF ¶ 29. Notably, this discipline was purely administrative even though Officer Espinosa had committed a criminal act which should have been formally investigated by Internal Affairs and reported to the State Attorney's office. *Id*. By contrast, when Plaintiff submitted an email to Defendant in response to Lt. Ricelli's falsification and misrepresentation, Defendant gave Plaintiff a five-day suspension without pay. Pla. SMF ¶ 30. Defendant stated that Plaintiff was not able to have an Internal Affairs investigation against his case because the email was evidence enough. *Id*. Nevertheless, these same rules, procedures, and disciplinary policies were not applied to Officer Espinosa, Officer Meadors, or Lt. Ricelli (all White), who were treated more favorably. *Id*.

Other examples favorable treatment toward non-black employees include as follows:

- Officer Manuel Lopez (White, male) was found to have referred to African Americans as "niggers" but received only a record of counseling. Pla. SMF ¶ 66.
- Officer Larry Laverde (White, male) was arrested for DUI whereby he struck a citizen causing injury and leaving the scene and was given only a twenty-day suspension with memorandum of understanding. Pla. SMF ¶ 68.
- Officer James McDonough (White, male) was investigated for, while he was on duty, attacking and beating a civilian causing serious injury. Defendant sustained the investigation's findings, but disciplined Officer McDonough with only a 20-day suspension. Pla. SMF ¶ 69.

Defendant may argue that these comparators are not similarly situated because they were mere Police Officers whereas Plaintiff was employed at a higher rank. Yet, many more examples exist with regard to non-black officers of a rank equivalent to or higher than Plaintiff:

- Lieutenant Leonard Ricelli (White, male) falsified official documents—allegations that were verified by Internal Affairs—yet he received no disciplinary action. Pla. SMF ¶ 70.
- Lieutenant Dak Simonton (White, male) was investigated and disciplined by Defendant's own Sexual Crimes Unit and Internal Affairs Unit with a recommendation for his dismissal, resulting from criminal misconduct involving the unlawful touching of a minor

female. Yet, Defendant allowed him to receive an administrative assignment and keep his rank and job, although a Disposition Panel consisting of two Majors and a Chief of Defendant's Miami-Dade Police Department found him guilty of the sustained findings. Pla. SMF ¶ 71.

- Sergeant Phillip Veloso (White, male), who failed to update his address and personnel data information received only a Record of Counseling, yet no discipline was imposed, although he had a history of prior discipline. Pla. SMF ¶ 72.

- Sergeant Vince A. Atherly (White, male) was investigated and found to have falsified payroll records for himself and other police officers on numerous occasions. Atherly also had a course of conduct and a history of prior disciplines. Though Atherly's supervising officers recommended dismissal, Atherly was ultimately given only a demotion with a memorandum of understanding. Pla. SMF ¶ 73.

- Sergeant Jose Arugu (White, male) was investigated for claiming multiple homes as his permanent registered address for homestead exemption purposes by Defendant's Internal Affairs division and the Economic Crimes Bureau. Although he was found guilty of this fraud, he was not terminated or otherwise disciplined, but simply allowed to pay civil fine. Pla. SMF ¶ 74.

These non-Black, individuals were similarly situated to Plaintiff in being accused of policy violations including General Conduct, Conduct Unbecoming an Officer, and Personnel Misconduct. Yet, they were treated more favorably even though their violations are more severe than the false violations of which Plaintiff was accused. Accordingly, Plaintiff has beyond doubt established a prima facie case of racial discrimination.

### C.    A Causal Connection Exists Between Plaintiff's Protected Activity And The Adverse Employment Actions.

As with his discrimination case, having readily demonstrated satisfaction of the first two elements of his prima facie case of retaliation, Plaintiff addresses the final element: that a causal connection exists between Plaintiff's protected activity and the adverse employment actions. To prove a causal connection between the protected activity and the adverse employment action, a plaintiff must demonstrate that the protected activity and the adverse action were not wholly unrelated. *Farley v. Nationwide Mutual Insurance Co.,* 197 F.3d 1322, 1337 (11th Cir. 2000). A

plaintiff can meet his burden of causation "by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Thomas v. Cooper Lighting, Inc.,* 506 F.3d 1361, 1364 (11th Cir. 2007). Courts have found that as much as a three to four month disparity between the statutorily protected activity and the adverse employment action is enough. *Id.* Even "[i]n the absence of close temporal proximity between the protected activity and the employer's adverse action, a plaintiff may be able to establish causation where intervening retaliatory acts commenced shortly after the plaintiff engaged in a protected activity." *Boyland v. Corrections Corp. of America,* 390 F. App'x 973, 974-75 (11th Cir. 2010).

Throughout the relevant time period, from July 2013 through February 2016, the record evidence demonstrates a clear practice and pattern by Defendant's agents of discriminating against African American employees, and—most importantly—retaliating against Plaintiff as he attempted to address this unlawful conduct at first through the proper chain of command up through the Office of the Mayor, and as well through the US Equal Employment Opportunity Commission.

In July 2013, Plaintiff reported officer Rachel Meadors (White, Female) to multiple Miami-Dade County local government officials, including members of Miami-Dade County Mayor's Office and Miami-Dade County Commissioners, for a policy violation for calling black and minority citizens "niggers and bitches" and engaging in discriminatory treatment toward the African American community. Pla. SMF ¶ 4. This report was based on complaints that Plaintiff had received as officer Meadors' supervisor from both private citizens and other officers. *Id.* The following month after reporting officer Meadors to Plaintiff's superiors, as well as local politicians and government officials in Miami-Dade County, Plaintiff's immediate supervisor, Lt. Leonard Ricelli, began giving Plaintiff negative monthly reports that were false and inaccurate. Pla. SMF ¶ 5. These false reports then adversely affected Plaintiff's overall performance evaluation, Plaintiff's opportunities for advancement, and generally altered the terms and conditions of Plaintiff's employment. *Id.* As a result, Defendant changed Plaintiff from a permanent employee to probationary status which affected the terms and conditions of Plaintiff's employment, including Plaintiff's annual performance evaluation, disciplines issued, and other rights provided for under the Collective Bargaining Agreement. *Id.*

Shortly after making these initials complaints of discrimination, on or about September 5, 2013, Plaintiff was involved in a shooting incident, specifically an Armed Robbery involving

three black males with guns. Pla. SMF ¶ 8. During an Internal Affairs investigation into Lt. Ricelli's misconduct with respect to this shooting incident, Defendant removed Plaintiff from Plaintiff's shift bid assignment, changed Plaintiff's days off and duty hours, and removed staff from under Plaintiff's supervision. *Id.* Defendant took this action despite that no investigation had been closed by the Homicide Bureau, the State Attorney's Office, or the Professional Compliance Bureau (Internal Affairs). Pla. SMF ¶ 9. Similarly, none of those agencies had found any wrongdoing on Plaintiff's part. *Id.* As such, Defendant had no policy basis in which to take these actions against Plaintiff. *Id.* Investigations into these kind of incidents often take years, but Defendant disciplined Plaintiff within the same month as the incident without cause or justification. *Id.* Furthermore, Defendant had not applied the same disciplinary standards to similarly situated, White officers who had also been involved in shooting incidents—incidents which the aforementioned entities had actively investigated. Pla. SMF ¶ 10. These incidents included Defendant's Special Response Team shooting unarmed males, as well as officers Ericka Terse's and Timothy Marchetti's shooting of an unarmed male in a stolen vehicle. *Id.* Notably, Terse and Marchetti had the same chain-of-command supervisors as Plaintiff did. *Id.*

Thereafter, Plaintiff had a meeting with Defendant's Police Director, JD Patterson, regarding the discriminatory and retaliatory treatment against Plaintiff by Plaintiff's superiors. Pla. SMF ¶ 11. When this meeting yielded no results, Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), on or about November 12, 2013, which was assigned Charge No. 510-2014-00613. *Id.* About one month later, on or about December 12, 2013, Plaintiff was suspended without pay for five regularly scheduled working days after reporting a crime of falsification against Lt. Ricelli. Pla. SMF ¶ 16. The falsification involved Plaintiff's Career Service Grievance against Lt. Ricelli, Captain Dieppa, Major Daniels, Chief Noel-Pratt, and JD Patterson who all defended Lt. Ricelli's falsifications and actions against Plaintiff and officer Germosen. *Id.* On or about December 20, 2013, Plaintiff timely filed a second Charge of Discrimination with the EEOC, which was assigned Charge No. 510-2014-01109. *Id.*

By further example, as mentioned previously, on or about April 28, 2015, the Professional Law Enforcement Association wrote a letter on Plaintiff's behalf to Director JD Patterson regarding the discrimination and retaliation to which Plaintiff had been subjected. Pla. SMF ¶ 28. As well, on or about April 30, 2015, Plaintiff filed a fourth Charge of Discrimination

with the EEOC, which was assigned Charge No. 510-2015-02961. *Id*. Shortly thereafter, in June 2015, Plaintiff drafted a Disciplinary Action Report for a female subordinate, Barbara Williams, who had violated several MDPD policies regarding adherence to the proper chain of command and tardiness. Pla. SMF ¶ 31. Pursuant to departmental policy, Plaintiff submitted to Chief Delma Noel-Pratt a memorandum requesting permission to carry out discipline as to Officer Williams. *Id*. Cpt. White intercepted the memorandum, however, and, on or about June 27, 2015, asked Plaintiff to alter the DAR or withdraw it entirely. *Id*. Plaintiff refused to change the DAR because it is unlawful to falsify an official document. *Id*. Plaintiff further stated to Cpt. White that he was covering up for this female subordinate in the same way that he had covered up for Officer Espinosa. *Id*. Cpt. White became very upset with Plaintiff and stated that he would keep Plaintiff in the office all night until Plaintiff changed the DAR. *Id*. Plaintiff again advised that Plaintiff would not violate the law, and Plaintiff requested to speak with Chief Noel-Pratt. *Id*. Plaintiff further requested protection from any "retaliation" by Plaintiff's superiors, but Defendant impeded those efforts by not following its own policies. *Id*.

Plaintiff was scheduled for two weeks of approved vacation leave during the last two weeks of August 2015. Pla. SMF ¶ 32. On or about August 14, 2015, Plaintiff was finalizing some administrative paperwork in advance of Plaintiff's vacation. *Id*. Included in this paperwork was a second DAR for Barbara Williams related to her failure to take action on a burglary alarm call to which she had responded. *Id*. Officer Williams had failed to exit her vehicle or conduct a proper perimeter search, though the subject was still in the building with physical evidence of the burglary at the scene. *Id*. All of this was caught on video. *Id*.

The very next day, August 15, 2015, Lt. Carl Manzelli informed Plaintiff that Plaintiff would need to come into the office, though Plaintiff was not scheduled to work, because Cpt. White wanted to meet with him. Pla. SMF ¶ 33. Plaintiff appeared as directed at the Northside District station where Plaintiff was assigned. *Id*. At the meeting, Cpt. White presented Plaintiff with a DAR, backdated to June 29, 2015, related to Plaintiff's refusal to change the first DAR Plaintiff issued to Barbara Williams. *Id*. Lt. Luis Vazquez was also present at the meeting. *Id*. Plaintiff borrowed his pen to sign the DAR. *Id*. Plaintiff then left the office to make copies of the DAR; Plaintiff returned and gave the originals back to Cpt. White. *Id*. He then gave Plaintiff a Notice of Intent to Discipline and Proposal of Action Sought which Plaintiff signed and also made copies and returned the original. *Id*. After copying the Notice, Plaintiff gave Cpt. White a

leave slip indicating that Plaintiff did not feel well and asked if Plaintiff could leave. *Id*. Cpt. White refused to let Plaintiff leave, thereby abusing his authority and setting Plaintiff up to be insubordinate. *Id*. When there was nothing left to be said, Plaintiff calmly exited the room, closed the door, and left the premises. *Id*. Unbeknownst to Plaintiff, after he had left, Cpt. White and Lt. Vazquez had become locked in the office where the meeting took place. *Id*.

Defendant then falsely accused Plaintiff of locking up Cpt. White and Lt. Vazquez in the Northside Lieutenant's office. Pla. SMF ¶ 34. This was despite the fact that Defendant had knowledge that the Northside Police District Station had not been issued or approved for a Certificate of Occupancy by ISD, Building Code Enforcement, or Miami-Dade Fire Department inspections. *Id*. Defendant failed multiple building inspectors' tests, and it had not followed safety procedures in occupying an unsafe building structure with malfunctioning doors and locks. *Id*. Defendant had previously received numerous reports and incidents of the door malfunctioning and locks jamming in the Northside building which caused other employees to be locked in on numerous occasions. Pla. SMF ¶ 35. Indeed, the Northside police district has failed several building inspections conducted by the Miami Dade Fire Department. *Id*. When Cpt. White and Lt. Vazquez allegedly were trapped by a locked door in said building, they failed to follow protocol which was to notify emergency maintenance staff, administrative staff, or a certified locksmith to release them properly. Pla. SMF ¶ 36. Instead, they became upset with Plaintiff and used a crowbar and a screwdriver to break the locks. *Id*.

Subsequently, Plaintiff was charged in a DAR, for breaking the locks, and for not updating Plaintiff's address for employee's personnel data information within 48 hours. Pla. SMF ¶ 37. Plaintiff was also transferred by Defendant without any written or verbal request by me, to the Kendall District (where Plaintiff had previously filed Internal Affairs and EEOC complaints involving officer Meadors, who was now assigned there as well). *Id*. Defendant requested Plaintiff's dismissal based on these false allegations. Pla. SMF ¶ 38. Plaintiff was accused of Insubordination, Personnel Misconduct, Conduct Unbecoming an Officer, and Personnel Data Change Information regarding Plaintiff's address. Defendant claims it did not have Plaintiff's address, yet it had no difficulty sending officers to the correct address in order to relieve Plaintiff of his law enforcement credentials and duties. *Id*. Indeed, Defendant had sent high-ranking officers to every single former address at which Plaintiff had lived, and which Plaintiff had provided to Defendant during Plaintiff's employment. *Id*.

On or about October 8, 2015, Plaintiff filed a Charge of Discrimination with the EEOC, which was assigned Charge No. 510-2016-00137 [Pla. SMF ¶ 51], and another one on or about October 20, 2015 which was assigned Charge No. 510-2016-00299 [Pla. SMF ¶ 53]. On or about October 21, 2015, Plaintiff sent written reports to Lt. Miguel Palacios and Cpt. Alejandro Acosta which described Plaintiff's claims of hostile work environment, harassment, false imprisonment, unlawful detainment, and unlawful search. Pla. SMF ¶ 54. Plaintiff's report was also sent to Director JD Patterson, Asst. Director Randy Heller, Chief Herman Organvidez, and Major Nancy Perez. *Id.* Furthermore, beginning on or about October 26, 2015, the Professional Law Enforcement Association separately wrote several letters to Director Patterson regarding the discrimination and retaliatory harassment. Pla. SMF ¶ 55. The PLEA requested Defendant to further take action against Lt. Diaz-De Villegas for Plaintiff's unlawful arrest and detention, yet no remedial or corrective action was taken. *Id.* Having received no relief, on or about November 9, 2015, the PLEA also wrote to Mayor Carlos Gimenez, but again no remedial or corrective action was taken. *Id.*

The very next day, on or about November 10, 2015, Plaintiff was given written notice recommending Plaintiff's discharge, which was signed by Lt. Fernand Charles, who had had no involvement in this matter. Pla. SMF ¶ 56. Cpt. Tyrone White initiated and drafted the DAR for Plaintiff's dismissal. *Id.* Lt. Carl Manzelli authorized and recommended Plaintiff's discharge based on the approval from Chief Delma Noel-Pratt, Director JD Patterson, Asst. Director Randy Heller, Major Ricky Carter, and Cpt. Tyrone White. *Id.* Cpt. White and Major Carter provided false information in the DAR against Plaintiff dated August 19, 2015, as well as in the relief of duty memo of the same date. *Id.* On or about December 31, 2015, Plaintiff timely filed a two Charges of Discrimination with the EEOC, which were assigned Charge No. 510-2016-00115 and 510-2016-00955.

Less than one month later, on Thursday, January 28, 2016, Plaintiff was afforded a final meeting with the Department Director J.D. Patterson, in reference to the DAR recommending Plaintiff's dismissal and termination. Pla. SMF ¶ 76. In attendance at the meeting was the Police Legal Bureau Senior Commander Janet Lewis, Personnel Management Bureau Major Adrienne Byrd, and Disciplinary Coordinator Lieutenant Javier Ruiz on behalf of Defendant. *Id.* Plaintiff was accompanied and represented by Teri Gutman-Valdez, of the Professional Law Enforcement Association. *Id.* Through this administrative means and process, Plaintiff was afforded an

opportunity to dispute the facts of the DAR. On Plaintiff's behalf, Gutman-Valdez again advised of the faulty investigation surrounding the circumstances and charges written in the DAR. *Id*. She advised that the discipline was issued on false allegations, and an incomplete and inaccurate investigation by all authorities who issued, recommended, and/or drafted the DAR. *Id*. She advised of the contradictive witness statements listed in the discipline narrative as it related to addresses, broken doors and the malfunction of lock mechanisms, and faulty ink pens not working at the Disciplinary Action Session Meeting that was held on August 15, 2015, by Captain Tyrone White and Lieutenant Luis Vasquez at the Northside District. *Id*.

These issues were raised as valid defenses in an effort to prevent the actions being taken against Plaintiff. Pla. SMF ¶ 77. The meeting, nevertheless, lasted only about ten minutes. *Id*. Under Administrative Order 7-3 or Chapter 15 of the Miami-Dade Police Department's Policy and Procedure, Director Patterson could have reduced Plaintiff's dismissal to a written reprimand or a suspension of varying length according to the weight and scale of discipline violations, but he refused to exercise this authority. *Id*. Instead, Director Patterson ignored the policy and procedures, and signed Plaintiff's Dismissal that same day. *Id*.

Following his unlawful termination, Plaintiff was instructed by Defendant to pick up his final paycheck and payout on February 5, 2016. Pla. SMF ¶ 79. Plaintiff's final paycheck covered Plaintiff's final two weeks of employment as well as a payout of approximately 324 hours of unused personal leave time. *Id*. Prior to February 5, 2016, Defendant had prepared and issued Plaintiff's final paycheck (#0360794) in the gross amount $17,953.30, and in the net amount of $10,446.35 after applicable taxes and deductions. Pla. SMF ¶ 80.

As Defendant had instructed, on February 5, 2016, Plaintiff appeared at 9105 NW 25th Street, Doral, Florida 33172 to pick up Plaintiff's final paycheck. Pla. SMF ¶ 81. Once Plaintiff arrived, however, Defendant refused to tender the paycheck to Plaintiff and advised that it had been returned to Defendant's payroll department. *Id*. Plaintiff was sent away by Defendant's Human Resource Manager Leila Zenati at 11:45 A.M. Pla. SMF ¶ 82. Zenati requested that Plaintiff's Employee Status Code be changed from "DJ" which means violation of departmental policy to code "BX" which means resignation or termination subject to the condition of the Alonso Ordinance, which includes no annual or sick leave payout. *Id*. The change of employee status code was requested by email at 2:41 PM, Friday, February 5, 2016, from Leila Zenati to Dan Gonzales, another Human Resource Manager. *Id*. Notably, this status change should have

been made prior to the finalization of Plaintiff's termination on January 28, 2016, but was likely made thereafter at the direction of JD Patterson as further retaliation against Plaintiff. *Id.*

Following the finalization of Plaintiff's dismissal and the denial of Plaintiff's last paycheck, on or about February 16, 2016, Plaintiff timely filed a final Charge of Discrimination with the EEOC, which was assigned Charge No. 510-2016-01800. Pla. SMF ¶ 83. Thereafter, Defendant retaliated against Plaintiff for filing additional EEOC charges, and prepared a subsequent, reduced paycheck (#0068634) to Plaintiff in the net amount $246.86, after applicable taxes and deductions. Pla. SMF ¶ 84. Also, after Plaintiff filed additional EEOC charges against Defendant on or about February 29, 2016, Defendant prepared two additional paychecks made out to Plaintiff in the amount of $2,557.64, dated March 22, 2016, paycheck (#0068981), as well as paycheck (#0069308) made out to Plaintiff in the amount of $700.19, dated April 8, 2016. *Id.*

In all of these instances, the close temporal proximity—ranging from one day to about one month—demonstrates that a causal connection exists between Plaintiff engaging in numerous acts of protected activity and then suffering some adverse employment action as a result.

### D. Defendant Reasons For Taking Adverse Action Against Plaintiff Are Merely Pretext For Unlawful Discrimination And Retaliation.

Having demonstrated prima facie cases of both discrimination and retaliation, Plaintiff finally addresses the only remaining issue: that Defendant's reasons for taking adverse action against Plaintiff are merely pretext for unlawful discrimination and retaliation. Preliminarily, a "plaintiff may support h[is] burden of showing pretext by providing other similarly situated employees who were not in plaintiff's protected group and who in engaged in similar conduct but were treated more favorably." *Hall v. Teva Pharmaceutical USA, Inc.*, Case No. 15-cv-61536-BLOOM/Valle. (S.D. Fla. September 30, 2016) (citing *Silvera v. Orange Cty. Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001)). Plaintiff has already addressed Defendant's disparate dispensation of discipline above, and will not replicate those arguments here. Suffice it to say that the egregious behavior that Defendant has permitted without dismissal of the offending officers readily evidences that Plaintiff's termination—for allegedly slamming a door and failing to update his address—must have been motivated by an unlawful discriminatory and retaliatory

animus. Notwithstanding the foregoing, Plaintiff analyzes the pretext issue under additional, well-settled legal standards.

Typically, in order to show pretext, Plaintiff must establish that either (1) a discriminatory reason more likely motivated his employer or (2) the employer's proffered reason is unworthy of credence. *See Jackson v. Alabama State Tenure Commission,* 405 F.3d 1276,1289 (11th Cir. 2005). To show a proffered reason is unworthy of credence, a plaintiff must establish "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons ... that a reasonable factfinder could find them unworthy of credence." *Moore v. Jefferson Cnty. Dep't of Human Res.,* 277 F. App'x 857, 859 (11th Cir. 2008) (citing *Cooper v. S. Co.,* 390 F.3d 695, 725 (11th Cir. 2004)).

About five months after Plaintiff's initial complaints about discriminatory conduct in July 2013, Defendant finally initiated an Internal Affairs investigation into Plaintiff's reports of policy violations, discrimination, and retaliation. Pla. SMF ¶ 13. Not surprisingly, however, this investigation itself was plagued corruption and political manipulation. *Id*. First, Plaintiff's allegations were altered, and the complaint was separated into two separate investigations, specifically in order to undermine the process overall so as to ultimately conclude in Defendant's favor. *Id*. Second, despite his own complicity in wrongdoing, Lt. Ricelli was allowed to conduct several investigations into officer Meadors who, due to the cover up, was exonerated on all charges of her personnel complaints made by citizens to Plaintiff as officer Meadors' immediate supervisor. *Id*.

Defendant largely refused to accept Plaintiff's complaints or to investigate Lt. Ricelli, Captain Dieppa, or Officer Meadors for their discriminatory and retaliatory practices. Pla. SMF ¶ 14. Defendant further attempted to circumvent these complaints by refusing to interview Major Stephanie Daniels of the Northside District, who was a key witness to all of Plaintiff's allegations and to whom Plaintiff had first complained. *Id*. Defendant also refused to interview Chief Noel-Pratt who was aware of Plaintiff's allegations. *Id*. Plaintiff also named and identified Police Legal Bureau Senior Commander Janet Lewis and Assistant County Attorney Erick Rodriguez, as key witnesses to support Plaintiff's complaint and allegations against Defendant's discriminatory practices, yet Defendant excluded them from its investigation. *Id*. This was to primarily undermine Plaintiff's EEOC Charge, which was filed on November 12, 2013, about

which Plaintiff was selectively interviewed for several hours by multiple investigators in Defendant's Internal Affairs Division on or about November 27, 2013. *Id*.

On or about November 20, 2013, the Mayor's Office also opened its own investigation into Plaintiff's complaints. Pla. SMF ¶ 15. The investigation was closed, however, the very next day at the request of JD Patterson's office by his Executive Assistance, Annette McCully. *Id*. Despite the investigation being closed, about one week later on November 27, 2013, the Mayor's Office, through Internal Affairs, compelled Plaintiff to come in and give a statement. *Id*.

Shortly thereafter, on or about December 12, 2013, Plaintiff was suspended without pay for five regularly scheduled working days after reporting a crime of falsification against Lt. Ricelli. Pla. SMF ¶ 16. The falsification involved Plaintiff's Career Service Grievance against Lt. Ricelli, Captain Dieppa, Major Daniels, Chief Noel-Pratt, and JD Patterson who all defended Lt. Ricelli's falsifications and actions against Plaintiff and officer Germosen. *Id*. On or about December 20, 2013, Plaintiff timely filed a second Charge of Discrimination with the EEOC, which was assigned Charge No. 510-2014-01109. *Id*. Plaintiff also filed several career service grievances against Defendant, as well as against Lt. Ricelli, Captain Dieppa, Major Daniels, Chief Noel-Pratt, and Director Patterson, yet the majority were denied—even though Defendant knew that Lt. Ricelli committed misrepresentation and falsification prior to any Internal Affairs investigation, and that officer Meadors referred to members of the African American community as "niggers and bitches." Pla. SMF ¶ 17.

This was likely in part because Police Director JD Patterson chose and allowed the highest-ranking member of the Internal Affairs Investigation Disposition Panel to be Chief Juan Santana who was the subject of two of Plaintiff's prior EEOC complaints and Career Service Grievances for discrimination and retaliation against Chief Santana. Pla. SMF ¶ 18. In other words, Defendant assigned Chief Santana—one of the subjects of Plaintiff's complaints—to the Disposition Panel that reviewed and adjudicated Plaintiff's Internal Affairs complaints. *Id*. Again, not surprisingly, the majority of Plaintiff's allegations were not sustained against Lt. Ricelli (except for "Falsification and Misrepresentation") and the allegations against Captain Dieppa were not sustained in their entirety. *Id*. Defendant, moreover, made sure there were no African American Chiefs or Majors assigned to the Disposition Panel to judge and assess the validity of the investigation surrounding Plaintiff's allegations of discrimination and retaliation against officer Meadors, Lt. Ricelli, Captain Dieppa and others. Pla. SMF ¶ 19.

Defendant was aware that Captain Michael Dieppa and Director JD Patterson had made prior on-the-record statements during the Internal Affairs investigation 2030-197 that Plaintiff had threatened to go to the EEOC and that Plaintiff had threatened to get a lawyer and file another case against Defendant.  Pla. SMF ¶ 20. Defendant knew or should have known that Chief Santana could not be a fair and impartial member of said panel, due to Plaintiff's prior grievances and EEOC charges against him, as well as a lawsuit which named Chief Santana as an adverse party. Pla. SMF ¶ 21. Finally, Defendant's Internal Affairs Unit falsified the Internal Affairs report, in an effort to undermine Plaintiff's pending EEOC charges. Pla. SMF ¶ 22.

In the DAR, dated August 19, 2015, Captain Tyrone White accused Plaintiff of leaving a Disciplinary Action Session without permission to go make copies. Captain White further asserts that Plaintiff did not have an ink pen so Lieutenant Vasquez gave Plaintiff an ink pen to sign the DAR for a five-day suspension. Pla. SMF ¶ 39. Although Plaintiff signed the documents in both Captain White's and Lt. Vasquez's presence, Captain White in a later written Memorandum, authored and signed in Major Ricky Carter's name, stated that neither Lieutenant Vasquez's or Plaintiff's ink pen was working and Plaintiff refused to sign the DAR. Pla. SMF ¶ 40. This, too, is a false statement written by Defendant in a Disciplinary Action Report, and further retaliation against Plaintiff. *Id*.

Indeed, Plaintiff was never insubordinate towards Plaintiff's superiors, nor was Plaintiff ordered to come back to the Lieutenant's office where the Disciplinary Action Session was held. Pla. SMF ¶ 41. Plaintiff had their permission to exit the room and go make copies once Plaintiff had signed the documents in their presence using Lt. Vasquez's blue ink pen. *Id*. Defendant never stated that Plaintiff was loud, angry, hostile, or even aggressive towards Plaintiff's supervisors in the DAR dated August 19, 2015. Pla. SMF ¶ 42. Plaintiff was respectful, cooperative, signed all copies and requested several times to go home sick, once his session was over. *Id*. Yet, Captain White taunted Plaintiff to further agitate the situation, and refused to let Plaintiff go home sick as Plaintiff had respectfully requested. *Id*. Defendant stated in the DAR dated August 19, 2015, that Plaintiff said Plaintiff was sick several times, and "appeared to be agitated." *Id*. Defendant was well aware that Plaintiff stated from the beginning of the session that Plaintiff attempted to take the entire weekend off because Plaintiff was not feeling well and needed time off. *Id*.

Following these events, Plaintiff was relieved from duty by Cpt. White and Major Carter's orders, effective August 18, 2015. Pla. SMF ¶ 43. Defendant had officers Lt. Adrian Cummings and Sgt. Malachi Smith enter Plaintiff's home that day and remove all of Plaintiff's department property and police credentials—further embarrassing and harassing Plaintiff in front of Plaintiff's family and neighbors. *Id*. On or about August 19, 2015, Cpt. White drafted a DAR and listed Lt. Carl Manzelli as the supervisory authority recommending Plaintiff's dismissal. *Id*. Notably, Lt. Manzelli had not been personally involved with or witness to any of these events, and thus was improperly included as the supervisory authority. *Id*.

On or about October 2, 2015, Plaintiff was criminally detained, illegally searched, and interrogated by Lt. Alex Diaz-De Villegas (White, male). Pla. SMF ¶ 44. Plaintiff was denied legal rights to have representation, or even go to the restroom or drink water. *Id*. Plaintiff's character was also defamed because Plaintiff was falsely accused of stealing Lt. Adrian Cummings' cell phone. *Id*. That day, Plaintiff was presented with a final five-day suspension by Lt. Cummings regarding the alleged incidents in August 2015 with Cpt. White and Officer Williams. Pla. SMF ¶ 45. Immediately afterwards, Lt. Cummings left the room and left his cell phone in Lt. Diaz-De Villegas' office. *Id*. Plaintiff left the room to make copies of Plaintiff's DAR. *Id*. Before Plaintiff left, Lt. Diaz-De Villegas held up a large cell phone and asked if it was Plaintiff's. *Id*. Plaintiff advised that it was not his. *Id*. Soon after, Plaintiff was called back and questioned regarding the whereabouts of Lt. Cummings' cell phone. *Id*. Plaintiff was accused of stealing the phone. *Id*. Lt. Cummings and Lt. Diaz-De Villegas spoke to Cpt. Acosta, Internal Affairs, and the General Investigative Unit of the Miami Dade/Kendall District and falsely stated to them that Plaintiff had stolen the cell phone. *Id*.

Plaintiff was illegally searched by Lt. Diaz-De Villegas, who removed Plaintiff's two personal cell phones, Plaintiff's wallet, and Plaintiff's keys. Pla. SMF ¶ 46. Lt. Diaz-De Villegas called Lt. Cummings into the office and asked him whether either phone was his. *Id*. Lt. Cummings advised Lt. Diaz-De Villegas that neither phone was his. *Id*. Plaintiff then asked Lt. Diaz-De Villegas if Plaintiff could leave freely. Pla. SMF ¶ 47. Lt. Diaz-De Villegas denied the request because Plaintiff was being detained pending criminal charges. *Id*. Plaintiff advised that Plaintiff wanted an attorney present. *Id*. Lt. Diaz-De Villegas stated that Plaintiff was not entitled to an attorney until Plaintiff admitted where Lt. Cummings' cell phone was. *Id*.

Lt. Diaz-De Villegas continued to question and detain Plaintiff without Miranda rights being read. Pla. SMF ¶ 48. Plaintiff again asked to be released or to be able to contact an attorney, but Plaintiff was again denied. *Id*. Plaintiff also asked to use the restroom and to get some water, but those requests were also denied. *Id*. Lt. Diaz-De Villegas order Detective Kaitlyn Grijalva to stay with Plaintiff and not let Plaintiff leave because Plaintiff was being criminally detained. *Id*. As a result of this unlawful detention, Plaintiff's blood pressure rose to a critically high level, and Fire Rescue had to be called to transport Plaintiff to Baptist Hospital Emergency Room for chest pains and dizziness. Pla. SMF ¶ 49. When Fire Rescue arrived at the Kendall Station, Lt. Diaz-De Villegas stated in front of the medics that Plaintiff was being detained as a criminal, and that they could not transport Plaintiff until he secured two police offers to accompany me. *Id*. Two uniformed Police Officers followed Plaintiff to the hospital and maintained throughout Plaintiff's entire stay at the hospital custodial detention pending a criminal investigation. *Id*.

Notably, Lt. Diaz-De Villegas (White, male) was also in the office when Lt. Cummings' cell phone was allegedly stolen, and he was the last person to have possession of the cell phone. Pla. SMF ¶ 50. This information was recorded in Defendant's own investigation report, and is consistent with Plaintiff's own personal observations. *Id*. Yet, Lt. Diaz-De Villegas—nor any of the other white officers in the building at the time—was not questioned, detained, searched, or otherwise treated as a criminal like me. *Id*. The State Attorney was contacted for a search warrant of Plaintiff's truck, but the office declined to issue one. *Id*. Internal Affairs was also on the scene but it declined to take over the investigation and, instead, turned it over to the General Investigation Unit. *Id*. The General Investigation Unit declined to arrest Plaintiff, and he was released from the hospital. *Id*.

On or about October 14, 2015, the PLEA made a public records request on Plaintiff's behalf for the police station surveillance footage from October 2, 2015 when Lt. Cummings' cell phone allegedly went missing. Pla. SMF ¶ 52. Yet, without justification or explanation, Defendant responded in writing, through Internal Affairs Records Supervisor Adreann L. White, that the video was no longer available despite that departmental policy was to maintain such footage for at least 60 days. *Id*. Furthermore, Defendant's own investigation report stated that the footage had been saved to two CDs by Internal Affairs Sgt. Jorge Cameron, and produced to the investigating officer, Det. Gerardo Trujillo. *Id*.

On or about November 23, 2015, the Florida State Attorney's Office initiated an investigation against Plaintiff concerning "a possible Grand Theft" involving Lt. Cummings' cell phone, which was based on the false police reports made by Lt. Cummings, Lt. Alexander Diaz-De Villegas, Detective Gerardo Trujillo and Defendant's Internal Affairs Unit. Pla. SMF ¶ 57. Defendant is further aware that Detective Gerardo Trujillo has a history of filing false reports, and has received discipline for being dishonest regarding the unauthorized use of physical force on an African American male, which Detective Trujillo attempted to cover up. *Id*.

Captain White authored the DAR, dated and drafted on August 19, 2015, that was used to terminate Plaintiff. Pla. SMF ¶ 59. Captain White was the actual authority on the DAR, and not Lieutenant Carl Manzelli as indicated thereon. *Id*. Captain White was the Acting Major of the Northside Police District on the date the DAR was initiated and drafted—August 15, 2015. *Id*. Captain White came in on the Midnight Shift of 10:00 PM to 8:00 AM, on Saturday, August 15, 2015, to serve Plaintiff with a previous five-day suspension written and authored by Captain White who was the Executive Officer of the Northside Police District at the time. Pla. SMF ¶ 60. With respect to alleged incidents of August 15, 2015, Captain White entered and recommended that Plaintiff receive only a 20-Day suspension according to Defendant's "DAGS" discipline system. Id. On August 25, 2015, however, Defendant's Police Director JD Patterson overruled Captain White's recommendation, and escalated the discipline to a termination and/or dismissal. *Id*.

On or about December 10, 2015, Lt. Fernand Charles responded to the Kendall Police District to serve Plaintiff the final recommendation of Plaintiff's termination DAR drafted by Cpt. White. Pla. SMF ¶ 61. Lt. Fernand advised that he did not have anything to do with the discipline or the investigation to sustain the discipline, nor was he the authority on the discipline. *Id*. Plaintiff advised him that discipline was false and that Lt. Manzelli was not the authority or the author the discipline, and that Plaintiff's rights were being violated. *Id*. Plaintiff also advised that the DAR indicated that Plaintiff was on probation. Lt. Charles circled the employee status section and put his initials there to indicate that it was incorrect. *Id*.

Finally, on January 28, 2016—the date JD Patterson finalized Plaintiff's termination after a 10-minute final appeal meeting—Patterson had already retired from his position as the Department Director, and had been on leave for the prior three months while exhausting his accrued vacation and sick time. Pla. SMF ¶ 78. At the time of Plaintiff's meeting, Patterson had

already delegated his authority to Juan Perez. *Id*. Notably, that same day, and at the same time of Plaintiff's meeting with Patterson, Mayor Carlos Gimenez announced that Juan Perez would be the new department director, and Perez officiated the swearing-in ceremony of the new class of police officers. *Id*.

From corrupt investigations and political manipulation to false allegations and misrepresentations of authority, every aspect of the "legitimate" reasons proffered by Defendant for disciplining and terminating Plaintiff is unworthy of any credence whatsoever. Instead, the evidence demonstrates an intentional pattern of discriminatory and retaliatory animus targeted at Plaintiff to ensure that he would be relieved of duty at any cost.

WHEREFORE, by reason of the foregoing, Plaintiff respectfully requests this Honorable Court **GRANT** the instant Motion for Summary Judgment as set forth above.

Dated: October 2, 2017                    Respectfully submitted,


                                          **/s/ Rainier Regueiro**
                                          **Anthony M. Georges-Pierre, Esq.**
                                          Florida Bar No.: 533637
                                          agp@rgpattorneys.com
                                          **Rainier Regueiro, Esq.**
                                          Florida Bar No. 115578
                                          rregueiro@rgpattorneys.com
                                          **REMER & GEORGES-PIERRE, PLLC**
                                          44 West Flagler St., Suite 2200
                                          Miami, FL 33130
                                          Telephone:  305-416-5000
                                          Facsimile: 305-416-5005

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 2, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

**Marlon D. Moffett, Esq.**
mdm2@miamidade.gov
**Javier Zapata, Esq.**
jzapata@miamidade.gov
Miami-Dade County Attorney's Office
Stephen P. Clark Center
111 N.W. 1st Street, Suite 2810
Miami, Florida 33128
Phone: (305) 375-2995
Fax: (305) 375-5611

/s/ Rainier Regueiro
**Anthony M. Georges-Pierre, Esq.**
Florida Bar No.: 533637
agp@rgpattorneys.com
**Rainier Regueiro, Esq.**
Florida Bar No. 115578
rregueiro@rgpattorneys.com